UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Anthony Armstrong
    Plaintiff,

vs.

TARGET CORPORATION, and
City of Minneapolis,

    Defendants.

COMPLAINT

CASE NO.

1. Plaintiff Anthony Armstrong as for his Complaint against the Defendants, states and alleges as follows:

## PARTIES

2. Plaintiff Anthony Armstrong is of Sri Lankan ethnicity / East Indian race, and was born in Minnesota in the year 1976 to naturalized citizens of the U.S.A., and who at all times material hereto has resided in Minneapolis, Minnesota.

3. Defendant TARGET CORPORATION is a duly authorized corporation having its principal place of business at 1000 Nicollet Mall, Minneapolis, MN 55403.

4. Defendant Minneapolis Police Department is a political subdivision of the City of Minneapolis with its present business address of 350 South Fifth Street, 130 City Hall, Minneapolis, MN 55415.

5. Officer Lieutenant Stoll, Badge #6872, is a member of the Minneapolis Department.

## NATURE

6. Plaintiff is bringing this action for damages based on violations of the Fourth Amendment of the U.S. Constitution and the Civil Rights Act of 1964.

7. Plaintiff filed Complaints with both the Minnesota Department of Human Rights and the Office of the Minnesota Attorney General within one year of the alleged incident as provided by M.S.A. § 363A.28, subd.3.

8. This lawsuit was filed 30 days after written notice to the Minnesota Department of Human Rights and 45 days after written notice to the Office of the Minnesota Attorney General as provided in 42 U.S.C. § 2000a-3(c).

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction of these claims based on 28 U.S.C. §§ 1331, 1367(a) and 1343(a)(3) because the action arises under a federal statute and the United States Constitution; the jurisdictional prerequisites have been met. This court also has subject matter jurisdiction based on 42 U.S.C. § 2000a-6(a).

10. Venue is proper in this Judicial District under 28 U.S.C. §§ 1391(b) and (c).

## BACKGROUND

11. On three separate incidents, spanning three and one-half years, the Defendants have deprived the Plaintiff of the full enjoyment of the rights available to other customers, not of dark skin. The Plaintiff brings this action against the third of the past three incidents; all three incidents having occurred at the same Target Department Store, 900 Nicollet Mall, Minneapolis, MN 55403. These incidents provide reasonable cause to believe that the Defendants are engaged in a pattern or practice of resistance to the full enjoyment of rights secured by the Civil Rights Act.

## HISTORY

12. On Monday, August 10, 2009 the Plaintiff traveled to the Target Department Store in RYAN COMPANIES US, INC building at 900 Nicollet Avenue, Minneapolis, Minnesota 55403. The time was approximately 11:00am before the lunch hour rush.

13. The Plaintiff wished to purchase the STERILITE ULTRA-SEAL® (8.1qt). It is a plastic food container with a patented water and air-tight seal in the lid. The Plaintiff had selected it carefully after much perusal within the month prior to August 10, 2009 at the very same store but did not have the cash to purchase the item in the $7.00 to $9.00 range. Priced high for a plastic food container, this product will remain shut – packed to maximum volume – dropped from waist-height upon a hard surface.

14. Upon entering RYAN COMPANIES US, INC "900" building, the Plaintiff immediately boarded the escalator to the second floor skyway level. The second floor of the downtown building – linked in all four directions via the downtown Minneapolis skyway system – provides entrance to the second level of the Target Department Store (which stocks *Housewares*). Since its grand opening, the Plaintiff has become familiar with items' whereabouts. Even the illustrious "escalator for carts" traveling between floors, is unique to this specific location. Another novelty is a security feature on every cart's wheels which lock when the cart is taken too far from the store's premises (a feature the Plaintiff has never tested).

## FACTS

*Civil Rights Violation & Negligent Infliction of Emotional Distress (¶15-28)*

15. The Plaintiff entered the store and walked down the main aisle beside the row of cashiers. A "female customer", Caucasian, approximately in her late twenties, stood near the aisle next to

2

the photo kiosk. She wore a TARGET CORPORATE Name Tag. Normally, the busy rush of corporate professionals does not begin at this particular department store until their lunch break; it was still late morning.

16. The Plaintiff asked her how she was able to view so many pictures from the photo terminal. She explained she had a USB flash drive. The "female customer" told the Plaintiff she was viewing photos of her sister and herself in Washington D.C. Most of her pictures were of them visiting the zoo. The Plaintiff commented on how uncomfortable it would be to pose near wild animals. At or about that time, a Caucasian, uniformed security guard, approximately in his early twenties, approached the Plaintiff.

17. *The uniformed security guard asked, "Are you using that terminal?"*

18. *The Plaintiff replied, "I'm looking at some pictures with her."*

19. *The uniformed security guard replied, "Why don't you use the terminal over there? No one is using it."*

20. *The Plaintiff replied, "I'm O.K., thanks."*

21. *The uniformed security guard motioned to a terminal on the far end of the kiosk saying, "This terminal is open and the photo attendant (kiosk attendant with a feigned look of enthusiasm) would be happy to show you how to use it (attendant beaming from ear-to-ear next to the terminal)."*

22. *The Plaintiff answered, "No thanks. I'm O.K."*

23. *The uniformed security guard came closer and leaned towards the "female customer" looking at her photos asking, "Are you O.K., Ma'am?"*

24. *The female customer replied, "Yes, I'm fine."*

25. The uniformed security guard walked away. The Plaintiff stood in shock in response to the uniformed security guard's actions.

26. *The Plaintiff whispered in the lady's presence, "Wow. I don't believe what just happened. I can't believe he just did that. That's never happened to me before. Are you O.K.?"*

27. *The "female customer" answered, "I'm fine (softly)."*

28. *The Plaintiff continued, in a whispered tone, "I can't believe he did that. I'm going to complain. I'm going to complain to his supervisor. Before I'm done with my shopping today, I'm going to make sure I speak with his supervisor. I'll make a formal complaint."*

### *Civil Rights Violation & Intentional Infliction of Emotional Distress (¶29-79)*

29. The Plaintiff saw the uniformed security guard who earlier attempted to distance the "female customer" from the Plaintiff. The Plaintiff rose his hand in the air, waived, and the security guard walked towards the Plaintiff. The Plaintiff read the guard's name tag, "Cody". The Plaintiff asked if he could speak to the store supervisor. Guard "Cody" said, "Sure, I'll get her", and casually left to find the supervisor. The Plaintiff was still standing beside the "female customer" who proceeded without break to click through her digital photos.

3

30. At that moment, the kiosk attendant exited the confines of her island shaped counter, walked around the entire kiosk and stood closely at the left hand side of the "female customer". The Plaintiff was already standing at the right-hand side of the "female customer".

31. *The Plaintiff spoke softly and casually to the kiosk attendant who was standing on the other side of the lady, "Thank you for calling the security guards on me. Obviously, I was going to physically assault her."*

32. *The kiosk attendant said, "I didn't call security. I really didn't."*

33. *The Plaintiff said, "Thank you for calling the security guards on me. Obviously, I was going to physically assault her."*

34. *The kiosk attendant said, "I didn't call security. I really didn't."*

35. *The Plaintiff said, "It's a good thing you called security. Obviously, I was going to physically assault her."*

36. At that same moment, a short, thin, Caucasian man, in his twenties, walked-up directly facing the Plaintiff, approximately twelve inches apart.

37. *The thin young man said, "That's not a very appropriate thing to say to her. I think you should leave the building."*

38. The Plaintiff ignored the *thin young man* (presumably a customer) and coolly looked away without a worry since they were standing in the middle of a very public area. Then the *thin young man* repeated himself.

39. *The thin young man spoke in his same soft voice, "That's not a very appropriate thing to say to her. I think you should leave the building."*

40. Not an inch of the thin young man's face displayed any expression except for a continuous slight squinting of the eyes. His eyes were unwavering. He stared directly into the Plaintiff's eyes only twelve inches from him. Lastly, his posture was motionless.

41. *This time, the Plaintiff answered, "I don't think so."*

42. *The thin young man responded, "You should leave the building."*

43. *The Plaintiff said, "I'm not going to leave the building."*

44. *The thin young man said, "You really need to leave the building now."*

45. Now, the Plaintiff actually felt threatened. The Plaintiff witnessed a man directly in front of him without any iota of hesitation or faltering, determined to have him leave the store.

46. *The Plaintiff leaned forward, so that his face was close to the thin young man's face saying, "You, leave the building," and reclined back into his initial repose.*

47. The Plaintiff could see speaking right in front of the thin young man's face, invoked no changed response.

48. *The Plaintiff said, "I am waiting for a meeting with the supervisor of this store. So, why don't you get lost."*

49. *The thin young man said, "Why don't you wait outside the store."*

4

50. Finally, the Plaintiff was beginning to realize only one response was going to be elicited from the stranger.

51. The Plaintiff asked, "Who are you? Who do you think you are?"

52. The thin young man then said, "I work here."

53. The Plaintiff said softly, "I am waiting here because one of your co-workers went to get the supervisor because I asked them to."

54. The thin young employee said, "I still think you can do that outside of the store."

55. The Plaintiff angrily and irritatingly retorted, "Who do you think you are? What do you think you are doing?"

56. A few seconds passed. The Plaintiff vehemently said, "You aren't the head-of-security. You can't kick me out of here."

57. The [thin young] employee said, "You need to leave."

58. The Plaintiff intensely said, "The only people who can kick me out of the store is the manager or the head-of-security. So, why don't you get lost. Because, I think you have a real problem!!"

59. The stranger said, "I don't have a problem. I think you should leave."

60. The Plaintiff repeated, "You're not a manager or head-of-security, so…(interrupted)"

61. The [thin young] employee interrupted, "I am the head-of-security."

62. The Plaintiff said, "You're not the head-of-security."

63. The [thin young employee] head-of-security said, "Yes I am."

64. The Plaintiff said, "Where's your I.D."

65. The [thin young employee] head-of-security said, "I don't have one."

66. The Plaintiff asked frantically, "If you're the head-of-security why didn't you just say so in the beginning?"

67. The alleged head-of-security said, "I'm telling you now."

68. The Plaintiff said, "Yeah…but…why did we just go through this argument over and over again, when you could have just said you're the head-of-security?"

69. The [thin young employee] head-of-security repeated, "I'm telling you now."

70. The Plaintiff said, "If you're the head-of-security, you have got to have some sort of identification stating you're the head-of-security. You have to have something."

71. The stranger dug into his front jeans pocket and pulled the same department store I.D. that all employees have [with their photo and the "bulls-eye" logo]. It read the name, "Bryan".

72. The Plaintiff said, "That's just the same I.D. everyone wears. That doesn't mean anything. That doesn't show you're the head-of-security. You have to have something which at least points out security."

5

73. *The employee/alleged head-of-security said, "This is it."*

74. *The Plaintiff said, "That I.D. just says you work for the department store and your name is "Bryan". There must be a bunch of people whose name is "Bryan" working for the store."*

75. *The employee/alleged head-of-security said, "No. I'm the only one."*

76. *The Plaintiff said, inquisitively, "You're the only "Bryan" working in this entire specific store?"*

77. *The employee/alleged head-of-security replied, "Yes."*

78. *The Plaintiff said, inquisitively, "In this entire store, there's no one else other than you who has the name Brian?"*

79. *The employee/alleged head-of-security replied, "Yes".*

<u>Civil Rights Violation (¶80-90)</u>

80. The store supervisor arrived: Caucasian, in her late twenties—early thirties, with the name tag, "Libby". After female store supervisor, "Libby", confirmed the head-of-security's identity, the three of them calmly discussed what options the Plaintiff had in regards to reporting his grievance over employee misconduct.

81. At that time, a Caucasian, uniformed security guard, with short blonde hair, approximately in his twenties, openly announced for all to hear that he is ejecting the Plaintiff from the premises until close of business that day. The Plaintiff would be able to return tomorrow. All stood silent. No one spoke.

82. The head-of-security did not acknowledge one of his subordinates just stopped mid-sentence the dialogue amongst the store supervisor, the Plaintiff and himself. The store supervisor did not mention it either. The uniformed security guard (second guard)(blonde hair) was speaking in authority over his boss (presumably) as well as the supervisor of the department store itself!

83. The head-of-security and store supervisor nearly had concluded their discussion with the Plaintiff about how to address grievances. Nonetheless, the uniformed security guard (second guard)(blonde hair) was halting the discussion at that point and ejecting the Plaintiff.

84. The uniformed security guard (second guard)(blonde hair) repeated his words and still no one spoke. The Plaintiff was not engaged in unlawful behavior.

85. *Finally, the Plaintiff said, "I'm in the middle of discussing an issue over a complaint with them."*

86. *The uniformed security guard (second guard)(blonde hair) said, "You have to either leave the store now, and come back tomorrow, or have a Minneapolis Police Officer escort you off the premises and he'll issue a no-trespass for one year."*

87. *The Plaintiff responded, "I'm not going to leave until I get the names of everyone here, so I can put it into my report."*

6

88. The female department store supervisor said that she would be willing to provide that information, off the premises, to the Plaintiff if he would like. The Plaintiff agreed to walk off the store premises with the female department store supervisor.

89. The "female customer" with photos/Target Corporate employee remained at the photo kiosk computer terminal, viewing photo after photo, still continuously without pause.

90. The Plaintiff walked into the Minneapolis skyway system while the female department store supervisor, "Libby", stood on the store grounds. Standing face to face, the Plaintiff borrowed the supervisor's pen and recorded [on the "postcard" that she had given him earlier] the names of the individuals involved as she knew them.

### Civil Rights Violation (¶91-96)

91. Once the Plaintiff recorded as many names the supervisor would provide, he noticed ahead of him the uniformed security guard (second guard)(blonde hair) standing beside a uniformed police officer, in Minneapolis Department colors, with utility belt, holster, and pistol worn.

92. Relieved to finally see someone apart from this department store's unreasonable staff who could certainly lay some reason to this fiasco and put an end to it, the Plaintiff raised his hand and waived towards the Police Officer.

93. *The officer responded and walked up along the left-hand side of the store supervisor, and immediately said, "You have to leave the building. You're on a no-trespass. If you return anytime within the next one year, you will be arrested. Do you understand?"*

94. *The Plaintiff said, alarmingly, "No. No. We're just talking. I'm just getting some names from them. I'm already off the premises. They said I could come back tomorrow. We're O.K. Just ask them."*

95. *The officer said, "Well now you brought me into it. If you come back within the next year, I will arrest you."*

96. *The Plaintiff replied with a dying, silent, "Hugh?"*

### Fourth Amendment Violation & Intentional Infliction of Emotional Distress (¶97-130)

97. The Officer was standing on the department store's premises. The female department store supervisor left the scene upon hearing the Officer state the no-trespass. The head-of-security remained which would have been off to the right-hand side direction of the Police Officer' right. The Police Officer told the Plaintiff that if he returns to the department store within the next year, he would be arrested.

98. *Immediately after the female store supervisor walked away, the officer asked, "Do you have some form of I.D."*

99. *The Plaintiff said, "Yeah. I have a driver's license," as he pulled his wallet out of his rear khaki pants pocket.*

7

100. The Plaintiff handed the Minnesota State Driver's License to the officer. The Officer grabbed the walkie-talkie device strapped around his back and up-and-around his shoulder, hanging, and recited the Plaintiff's driver's license number to dispatch.

101. *After reciting the digits, the officer asked, "Do you have anything in your pockets? What do you have in your pockets? Empty out your pockets?"*

102. The Plaintiff started pulling out the inner-lining of his pants front pockets to reveal nothing except tissue in his left pocket.

103. *The Officer said, "What do you have in your left pocket?"*

104. *The Plaintiff said, "Nothing."*

105. The officer told the Plaintiff he was checking to see if there were any warrants out against him.

106. At that time, one lady started walking towards the exit of the store and passed by the officer and head-of-security and then passed behind the Plaintiff who was standing in the skyway property. The woman was Caucasian, approximately in her thirties, and relatively tall. Her eyes appeared reddish and intense. She looked squarely at the Plaintiff as she walked by and with such disdain the Plaintiff felt ashamed, vulnerable, and degraded. After that lady, another woman began approaching again towards the rear of the head-of-security and the officer on her way towards exiting the premises, [then entering the skyway, and then ultimately leaving the building].

107. *At that moment, the Plaintiff said, "I'm not comfortable standing here."*

108. *The Officer asked, "Would you rather go into the security room and finish this?"*

109. *The Plaintiff nervously exclaimed, "No! No!" The Plaintiff then explained, "It's just that everyone's watching me. I feel very uncomfortable."*

110. *The head-of-security responded, "No one is watching you." (Just as a woman passes by watching intently eye-to-eye with the Plaintiff.)*

111. The officer received a response from dispatch that there were no warrants on the Plaintiff's record and handed back the driver's license to the Plaintiff.

112. *The officer then asked the Plaintiff, "Where do you live?"*

113. *The Plaintiff answered, "I live in Southeast."*

114. *The officer asked, "Where?"*

115. *The Plaintiff said, "Southeast."*

116. *The officer asked, "Where do you work?"*

117. *The Plaintiff answered, "I work in downtown...downtown Minneapolis."*

118. *The officer asked, "What do you do?"*

119. *The Plaintiff answered, "I'm a paralegal. I do paralegal research."*

120. *The officer asked, "Who do you work for?"*

121.   *The Plaintiff said, "I work for various attorneys."*

122.   *The officer asked, "Who?"*

123.   *The Plaintiff answered, "Various attorneys."*

124.   *The officer asked, "Which attorneys?"*

125.   *The Plaintiff repeated, "Just...various attorneys."*

126.   *The officer spoke, aloud, "Various attorneys...," and then asked, "What building do you work in?"*

127.   *The Plaintiff said, "I work in the Hennepin County Government Center."*

128.   *The officer said, inquisitively, "You work for Hennepin County?"*

129.   *The Plaintiff said, "No. I just use their services. I use the services in the Hennepin County Government Center."*

130.   *That was* the last question.

## COUNT ONE

131.   The Plaintiff restates and incorporates by reference paragraphs 1 through 130 hereinabove.

132.   TARGET CORPORATION is liable under *the doctrine of Respondeat Superior* for the acts by the employees of Target Department Store in the scope of their employment.

133.   The uniformed security guard, "Cody" unnecessarily intruded into the individual liberty of the Plaintiff to interact publically with the female customer/Target Corporate employee.

134.   The race of the Plaintiff was a motivating factor – "played a part" – in the uniformed security guard, "Cody's" decision to interfere.

135.   Plaintiff is entitled to relief pursuant to 42 U.S.C. § 2000a, and for Negligent Infliction of Emotional Distress.

## COUNT TWO

136.   The Plaintiff restates and incorporates by reference paragraphs 1 through 135 hereinabove.

137.   TARGET CORPORATION is liable under *the doctrine of Respondeat Superior* for the acts by the employees of Target Department Store in the scope of their employment.

138.   The head-of-security owed a duty of reasonable care as a security agent to provide an environment where the general public may feel safe.

9

139. In the same or similar circumstances, a reasonable security agent wearing plain, street clothes upon hearing sarcastic remarks, would have identified himself as a security agent and asked the customer to leave the premises.

140. By attempting to incite an emotional response through deceitful representation and inducement, the head-of-security *breached his duty of care* to Plaintiff.

141. Plaintiff would not have suffered direct, immediate emotional injury *but for* the luring design of the action of the head-of-security.

142. The head-of-security's action *proximately caused* emotional injury to the Plaintiff, because the emotional injury was *reasonably foreseeable* as an outcome of repeated, continued attack.

143. Plaintiff is entitled to relief pursuant to 42 U.S.C. § 2000a, and for Intentional Infliction of Emotional Distress.

## COUNT THREE

144. The Plaintiff restates and incorporates by reference paragraphs 1 through 143 hereinabove.

145. TARGET CORPORATION is liable under *the doctrine of Respondeat Superior* for the acts by the employees of Target Department Store in the scope of their employment.

146. The uniformed security guard (second guard)(blonde hair) infringed on the Plaintiff's constitutionally protected civil rights.

147. The uniformed security guard (second guard)(blonde hair) demanded upon Plaintiff: a) leave the premises immediately, or b) wait until a Minneapolis Police Officer arrives to escort you off the premises, and then issue a one-year no-trespass order.

148. The uniformed security guard (second guard)(blonde hair) had no reasonable cause to ban Plaintiff. The Plaintiff did not engage in unruly or disorderly conduct, nor did he disturb the peace or loiter.

149. The Plaintiff is entitled to relief pursuant to 42 U.S.C. § 2000a.

## COUNT FOUR

150. The Plaintiff restates and incorporates by reference paragraphs 1 through 149 hereinabove.

151. TARGET CORPORATION is liable under *the doctrine of Respondeat Superior* for the acts by the employees of Target Department Store in the scope of their employment.

152. The off-duty Police Officer infringed on the Plaintiff's constitutionally protected civil rights.

153. The off-duty Police Officer declared an administrative no-trespass of one-year against the Plaintiff prohibiting him from entering the premises.

154. The off-duty Police Officer had no *reasonable articulable suspicion* to ban Plaintiff from the premises. The Plaintiff did not engage in unruly or disorderly conduct, nor did he disturb the peace or loiter.

155. The Plaintiff is entitled to relief pursuant to 42 U.S.C. § 2000a.

## COUNT FIVE

156. The Plaintiff restates and incorporates by reference paragraphs 1 through 155 hereinabove.

157. The Defendant City of Minneapolis is liable under *the doctrine of Respondeat Superior* for the acts by the employees of the City of Minneapolis in the scope of their employment.

158. The Defendant interfered with the Plaintiff's constitutional rights.

159. The Defendant had a duty to preserve the peace and protect the welfare.

160. The Defendant performed an impermissible *search and seizure* of the Plaintiff.

161. The Defendant had no *reasonable articulable suspicion* for detaining the Plaintiff.

162. The Plaintiff's administrative no-trespass did not permit the Defendant to *investigate unrelated matters* nor to *detain* for any time longer than necessary to execute the administrative no-trespass.

163. The Plaintiff verbally expressed *non-consent* to the Defendant.

164. The Defendant allowed a *private* security guard to passively participate with the detention.

165. The Plaintiff would not have suffered a direct, immediate emotional injury *but for* the action of the Defendant ungrounded in law and without permission.

166. The Defendant's action *proximately caused* the emotional injury to the Plaintiff, because the emotional injury was *reasonably foreseeable* as a result of the restrictive nature of detention.

167. The Plaintiff is entitled to relief pursuant to the Fourth Amendment, and for Intentional Infliction of Emotional Distress.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks relief from this Court against Defendants as follows:

That the practices of the Defendants complained of herein be adjudged, decreed and declared to be violative of the rights secured to the Plaintiff by the Fourth Amendment and the Civil Rights Act of 1964.

That a permanent mandatory injunction be issued requiring that the Defendants adopt practices in conformity with the requirements of the Fourth Amendment and the Civil Rights Act of 1964.

That a permanent prohibitory injunction be issued prohibiting the Defendants from engaging in the practices complained of herein.

An Order directing the Defendants to cancel or remove the administrative no-trespass.

That plaintiff be awarded compensatory damages in an amount to be established at trial.

That plaintiff be awarded punitive damages in an amount to be established at trial.

That the Court order the Defendant to pay the Plaintiff out-of-pocket expenses of this action.

For such other and further relief as the Court may deem just and proper.


JURY TRIAL DEMAND (for Constitutional claims & common-law claims of distress only; not for statutory claims)


Dated at Minneapolis, Minnesota this 12th day of April, 2010.

Pro Se   Signed: _____
Anthony Armstrong
Freelance Paralegal – ABA (SCOLA) approved
P.O. Box 14266
Minneapolis, MN 55414
Cell: (612) 298-4418
*anthny7890@hotmail.com*